# THE STATE v. TAYLOR, Appellant.

## Division Two, February 3, 1903.

1. **Information: DISMISSAL: BAR.** A dismissal by the prosecuting attorney of an information charging murder, is no bar to a conviction under a subsequent indictment charging the same offense.

2. **Challenging the Array: RIGHT OF DEFENDANT IN JAIL.** It is not the duty of the court of its own motion to have a defendant confined in jail brought into court in order that he may exercise the privilege of challenging the array of grand jurors impaneled for the purpose of investigating criminal offenses, among others, the one for which he may afterwards be indicted. It is the business of such offenders to know of the impaneling of the grand jury, and if they desire to challenge the array or any member of it, it is their duty to apply for leave to appear. And an indictment is not invalid for the mere reason that the court did not of its own motion bring into court a defendant confined in jail at the time the grand jury was sworn.

3. **Plea of Guilty: RECORD: IMPEACHMENT.** The record of a court which recites that defendant entered a plea of guilty, can not be overcome by a motion and the affidavits of witnesses showing that the plea was entered by defendant's counsel. The absolute verity imported by a record can not be overcome in such a way.

4. **Excusing Juror: DISCRETION OF COURT.** It is within the discretion of the trial court to excuse, of its own motion, a venireman on his *voir dire* examination, and in the absence of some showing by the defendant that he was prejudiced thereby, he is in no condition to complain of such action.

5. **Reasonable Doubt: WHEN FULLY INSTRUCTED.** Where the law of reasonable doubt is fully presented by the instructions given, no error is committed in refusing others covering the same question asked by defendant.

6. **Deliberately: WRONGFUL DEFINITION.** Where there is no evidence of sudden passion, it is not error to give an instruction which defines "deliberately" as being "a cool state of the blood, not in a heat of passion, caused by some just or lawful provocation to passion."

7. **Insanity: SUBSTANTIAL EVIDENCE: APPELLATE PRACTICE.** Where the defense is insanity, and that issue is submitted to the jury in a

Vol 171 mo—30.

properly-worded instruction, the appellate court will not interfere on that score, if it can not be said that there was no substantial evidence to support the jury's finding that defendant was sane.

Appeal from Jackson Criminal Court.—*Hon. Samuel Davis*, Special Judge.

AFFIRMED.

*L. C. Boyle* and *W. F. Riggs*, for appellant.

(1)  The right to be present in all criminal prosecutions includes the right to be present when the grand jury is impaneled, and can not be confined to the hour and place of actual peril when the accused shall stand before the petit jury.   State v. Warner, 65 S. W. 584; State v. Kyle, 166 Mo. 287; Thom. and M. on Juries, sec. 497; 1 Chitty's Crim. Law, 314. We admit the law is, in order to preserve this constitutional and statutory right (sec. 2487, R. S. 1899), "defendant must make his wish known to the trial judge." Barkman v. State, 52 S. W. 73. But, under the facts disclosed in the plea in bar, and admitted to be true, defendant was not in default.   The prosecuting attorney well knew "it has always been recognized that the accused has the right to be present when the grand jury, who alone can prefer the indictment, is being impaneled and organized." State v. Warner, 65 S. W. 588. And even-handed justice requires he should have entered a nolle prosequi to the information before the special grand jury was impaneled and organized.   For this purpose he alone possessed all the power known to the law, and neither the judge, nor all the judges of this court, can advise or prohibit or in any manner interfere with the discretion of a prosecuting attorney, before trial, entering a nolle prosequi.   Com. v. Wheeler, 2 Mass. 172; Com. v. Tuck, 20 Pick. 365; Agnew v. Co. Comm., 12 S. & R. 95; Rex v. Stratton, 1 Doug. 239.   (2) The only possible judgment the court was authorized to enter was judgment of discharge, and the judgment leaves the "cause" in the exact situation the prosecutor asked.

State v. Eaton, 75 Mo. 589; State v. Madigan, 48 Ind. 416; State v. McLane, 31 Tex. 260; Herman on Estoppel and Res. Adj., p. 491; United States v. Sanges, 144 U. S. 310. An oral nolle prosequi is as irrational as is an oral information; and, therefore it is not founded on a nolle. And if the judgment is not according to the course of common law, it is still a judgment, and when the prosecutor changes his mind he can apply for the writ of certiorari. People v. Burney, 29 Cal. 459; City v. Boundy, 105 Mich. 670; State v. Jefferson, 66 N. C. 309; State v. Sewpson, 83 N. C. 584; Comm. v. Haas, 57 Pa. St. 443; Comm. v. Wallace, 114 Pa. St. 405; State v. The Judges, 3 Har. and McH. 115; Constitution of Missouri, art. 6, sec. 3; 77 Mo. 191; 53 Mo. 97. A nolle prosequi is not a judicial determination, but the mere act of the prosecuting attorney. The court had no power to interfere. Reg. v. Allen, 1 B. & S. 850; State v. Thornton, 13 Ired. 257; People v. McLeod, 25 Wend. 382; State v. Smith, 49 N. H. 155.

*Edward C. Crow,* Attorney-General, and *Jerry M. Jeffries* for the State.

(1) There is nothing to prevent the grand jury from finding a true bill against one who is already legally charged with the crime they have indicted him for. This they can do while the old charge stands. Perkins v. State, 66 Ala. 457. The very fact that an information was pending against defendant charging him with this crime did not prevent the grand jury from indicting him. Bishop's Criminal Procedure, sec. 770; State v. Webb, 74 Mo. 333; State v. Vincent, 91 Mo. 662. The prosecuting attorney need not have nolle prosequied the information, for the filing of the indictment thereafter would have forced it. State v. Hoffman, 70 Mo. App. 271. The filing of the indictment by the grand jury was to all effects and purposes the presentation of a new case against the defendant, the former information having been dismissed, and the State refusing to prosecute the defendant further under that information,

it is not a bar to this action. State v. Burlingame, 146 Mo. 207; State v. Goddard, 162 Mo. 198; State v. Eagan, 75 Mo. 586. The judgment on the information is nothing more than a nolle prosequi. It simply puts an end to that particular information, or whatever part of it may have been disposed of, and the State can not afterwards proceed in the same suit, but it can begin anew. Bishop's Criminal Procedure (4 Ed.), sec. 1395; Goddard v. Smith, 6 Mod. 262; Ex parte Donaldson, 44 Mo. 149; State v. Primm, 61 Mo. 166. (2) The law is that it is no excuse for failure to challenge the panel of grand jurors that the defendant was confined in jail and had no opportunity to so make the challenges, but the accused must demand to be brought into court to exercise his privilege. This was not done in this case. People v. Romero, 18 Cal. 94; Moher v. Tate, 3 Minn. 404; Hudspeth v. State, 50 Ark. 534; Dobson v. State, 17 S. W. 3; Webb v. State, 44 S. W. 489; State v. Holcomb, 86 Mo. 376; State v. Williamson, 106 Mo. 162; State v. Turlington, 102 Mo. 642. (3) The record shows that the attorneys of the defendant entered his plea of not guilty to the indictment. This is sufficient. Bishop's Criminal Law (4 Ed.), secs. 728 to 733; State v. Grate, 68 Mo. 22; State v. Sanders, 53 Mo. 243. The plea as entered in this case was amply sufficient. State v. Braunschwing, 36 Mo. 397. (4) The court did not err in excusing, of his own motion, venireman Moore. This was entirely discretionary with the court, and unless the defendant could show prejudice from such act it would not be reversible error. He has shown no prejudice. (5) Where a juror had an opinion founded on newspaper accounts which purported to give the facts as to the guilt or innocence of the defendant and still entertained that opinion, and it would require evidence to remove it, yet that he could give the defendant a fair and impartial trial, it was held no error to retain such juror on the panel. State v. Hunt, 141 Mo. 626. The record shows that appellant challenged certain jurors but gave no reason for his challenge. This prevents

him from raising any objections to the jury after the trial is entered.   In a challenge of a juror, the grounds of his incompetency should be stated.   A mere challenge for cause is not sufficient.   State v. Soper, 148 Mo. 217; State v. Albright, 144 Mo. 638; State v. Taylor, 134 Mo. 109.   (6)   Appellant complains of the action of the court in giving instruction 5, with reference to reasonable doubt.   This instruction properly declared the law and it told the jury that if they had a reasonable doubt of defendant's guilt they should acquit him. Such an instruction has been often approved by this court.   State v. Jackson, 162 Mo. 291.

BURGESS, J.—On May 7, 1901, defendant was indicted in the criminal court of Jackson county, and charged with murder in the first degree for having theretofore, to-wit, on March 2, 1901, at said county, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, shot and killed, with a rifle gun, one Ruth Nollard. He was afterwards put upon trial in said court under said indictment and convicted of murder in the first degree, and his punishment fixed at death.

After unavailing motions for new trial, and in arrest, defendant appeals.

The killing was not denied.   The defense was insanity.

At the time of the homicide defendant was about twenty-three or twenty-four years of age, and engaged as manager of a skating rink in Kansas City, Missouri. The deceased was at that time about eighteen years of age, and was in the service of a dry goods establishment in said city.   They met for the first time in October, 1900, from which time defendant, although a married man, having a wife and a small child, with whom, however, he was not living, sought to pay attention to the deceased.   She was not aware at the time that he had a wife, nor did she become aware of the fact for sometime after he began waiting upon her.   His wife left him because he had assaulted and choked her, and she

was afraid of further violence at his hands if she continued to live with him.

After deceased learned that defendant was not a single man, she advised him of it, and tried to get him to desist from his attentions to her, but he refused to do so. Something like two years previous to the homicide, Miss Nollard met a young man by the name of William H. Jones, to whom previous to the homicide she was engaged to be married. Jones was living in Chicago and a correspondence was kept up between them. When the defendant sought to press his suit for Miss Nollard's hand, it was first met with a statement that he was a married man. This he admitted, but said that he had instituted proceedings for a divorce, and that matter would not long be in the way. He was then told that Ruth was engaged to Jones, and that she would not marry him, the defendant, under any circumstances, but he continued to pay his attentions to the girl against her will and against the will of her parents. She avoided meeting him at all times as far as possible, and when he would come to her home, she insisted on some member of the family remaining with them, as she could not induce him to leave otherwise. On one occasion he hit her and beat her and choked her until she promised to marry him. On several occasions similar occurrences took place. Twice warrants were sworn out for his arrest, but no prosecution followed.

Harry Jones came from Chicago to Kansas City to visit Miss Nollard in the winter of 1900-1901. He met the defendant, who first undertook to discourage him in his suit for her hand, by telling him that she was deceiving him, that she would not marry him, that she would kill herself first, and things of that character. Jones, however, was not to be deterred. Then, on or about the 7th day of January, 1901, the defendant sent to Harry Jones a letter of warning. The letter was written on Tuesday night, and was as follows:
"Mr. Harry Jones:

"If you value your life, you will leave Kansas City by Wednesday night. Ruth Nollard will never

marry you or any other man.   When Ruth dies, I die.
Harry Jones, don't you dare write to Ruth when you
leave.''

Afterwards, Jones saw him about this letter.   De-
fendant told him that he was excited, didn't mean any-
thing by it, but that Miss Nollard had told him, the
defendant, that if he, defendant, would not marry her
she would take laudanum.   After completing his visit,
Jones left and returned to Chicago, and the correspon-
dence with the girl continued, and the defendant knew
of that fact, and continued to press his suit for Miss
Nollard's hand.   In order to avoid the continued an-
noyance of the defendant's presence, Miss Nollard was
sent from home, where she remained a week or ten days.
The defendant continued to apply at the Nollard home
and make inquiry for her and made numerous threats
against her if she would not marry him.   He then rented
a room in the front part of a residence on West
Ninth street in Kansas City.   He secured a third-
floor front room and told the owner of the residence that
he was night operator at one of the railroad offices and
would not be in his room of nights, but would be there
only during the daytime.   At the time of the homicide,
the deceased and Louise Nollard, her sister, were pass-
ing down Ninth street, Louise going to her work, and
deceased accompanying her.   When opposite the room
rented by the defendant, Ruth Nollard was killed.   Her
sister, Miss Louise, described the killing as follows:
''She was going to take me back to work and just as
we got almost to Bank street, I heard a shot and she
staggered and I threw my arms around her, and then
another shot and I looked to see where it came from and
I could see the shot came from the third window.   I
tried to hold her, but I couldn't.   Had to let her go.
A third shot was fired and I jumped and stooped over
her and she rolled her eyes up just as if she wanted to
say something.   She just screamed.   I think she said,
'I am shot,' but I know she screamed and I tried to pick
her up.   She couldn't speak, because we both begged
her, mamma and I.''

The girl was taken to a drug store near by and from thence conveyed home, where she died almost as soon as she reached her home.

An officer made an examination of the room from where the shot came, found it filled with smoke, cartridges in the drawer of the dresser in the room and a rifle on the floor and one cartridge placed in the rifle. Just back of this room, in room No. 6, the defendant was found lying under the bed, on his stomach, with his hands over his face. He told the officer that he shot Ruth Nollard, and said to him, "You would have done the same thing, if she treated you that way." An examination of the girl disclosed that two shots struck her, either one of which would have been sufficient to produce death.

Evidence was adduced on behalf of defendant which it is unnecessary to set forth that tended to show he was insane at the time of the commission of the homicide.

It appears from the record that on April 30, 1901, the court ordered a special grand jury to report on May 2, 1901; that a grand jury was summoned and convened in accordance with the summons, and on the seventh day of that month returned into court the indictment under which defendant was convicted. That on the 19th day of May, 1901, the defendant was duly arraigned on the indictment and pleaded not guilty, and the information which had been filed against him by the prosecuting attorney on the 6th day of March, 1901, charging the defendant with murder in the first degree, it being for the same offense, was on the next day following, to-wit, March 7, 1901, dismissed by the State.

On the 26th day of September, 1901, defendant withdrew his plea of not guilty to the indictment, theretofore entered, and pleaded in bar the order and judgment of the court in dismissing the information against him, which said plea was overruled. He then re-entered his plea of not guilty to the indictment.

Defendant then filed his application for a change of

venue from Jackson county on the ground, as alleged, of the bias and prejudice of the inhabitants of the county against him.

The verdict of the jury was returned into court on the 9th day of October, 1901, and on the 26th day of October, next thereafter, defendant filed his motion to correct the record as to said plea of not guilty.

It is said in behalf of defendant that the order dismissing the information presented against him by the prosecuting attorney, being for the same offense as that for which he was afterwards indicted and convicted, is in the nature of a final judgment, and a bar to any further prosecution against him for the same offense. But as the defendant had never been put in jeopardy under the information, its dismissal was no bar to an indictment for the same offense. [State v. Wiseback, 139 Mo. 214.]

"The general rule established by the preponderance of judicial opinion and by the best considered cases is that when a person has been placed on trial on a valid indictment or information before a court of competent jurisdiction, has been arraigned, and has pleaded, and a jury has been impaneled and sworn, he is in jeopardy, but until these things have been done jeopardy does not attach." [17 Am. and Eng. Ency. of Law (2 Ed.), 584.]

By section 2522, Revised Statutes 1899, it is provided that a new indictment may be found against the same party for the same offense against whom there is an indictment pending at the time, and, as indictment and information are now concurrent remedies (State v. Kyle, 166 Mo. 287), the same rule applies to them. But in the case at bar the information was dismissed before the indictment was presented by the grand jury, and as its dismissal was no bar to the finding of an indictment there is no merit in the plea in bar.

This question was before this court in the recent case of State v. Goddard, 162 Mo. 198, and it was held that the dismissal or quashing of a first indictment is no bar to a second prosecution or a second indictment.

It is claimed for the defendant that as he was confined in jail at the time the jury who preferred the indictment against him was impaneled, and was not given an opportunity to challenge the array, the indictment was invalid. It is said in State v. Holcomb, 86 Mo. 371, that "challenge to the array, or to any one of the grand jurors, is no longer allowed, except on the ground that the juror is the prosecutor or complainant, or a witness on the part of the prosecution. [Secs. 1772, 1773, R. S. 1879; secs. 2487, 2488, R. S. 1899.] The plea does not claim that the jurors, or any of them, were objectionable for these, or indeed for any reason. It would be a mere idle ceremony to sustain the plea, when the defendant makes and has no valid ground for a challenge." [State v. Williamson, 106 Mo. 162.] So, in the case at bar, there is no pretense that the jurors, or any of them were objectionable to defendant for any reason, or that he requested to be present when they were impaneled.

But it is insisted that as defendant was at the time confined in jail, he should have been informed of his right to challenge the array. While it is true that defendant was at the time confined in jail, it was to answer before the grand jury for the identical offense for which he was indicted by them, and it was his business to know of their being impaneled, and that it was for the purpose of investigating offenses of a criminal character, and to prefer indictments against such offenders, if they believed from the evidence before them the charges to be true, and if defendant desired to challenge the array or any member thereof it was his duty to have applied for leave or requested permission to appear and do so, but it was not the duty of the court to have him brought into court of its own volition in order that he might exercise this privilege. [People v. Romero, 18 Cal. 89.] In the case of Dobson v. State, 17 S. W. 3, under a statute in all essential particulars like our own, it was held that a motion for a new trial, on the ground that defendant was in jail, and had therefore no opportunity to challenge the grand jury finding the second

indictment, was properly overruled where it was not shown, as in the case in hand, that any valid cause of challenge existed.   Moreover, the only available objection that defendant could have had to any one summoned to serve as a grand juror, before he was sworn, must have been on the ground that he was the prosecutor or complainant upon the charge against him, or that he was a witness on the part of the prosecutor, and had been summoned or bound in a recognizance as such (sec. 2487, R. S. 1899), and there is no pretense or claim that any such cause of objection to any member of the grand jury existed in this case.   Our conclusion is that no error was committed in this regard.

It is insisted with much earnestness that the record discloses that the defendant was tried and convicted without legal arraignment and plea of not guilty.   The record, however, shows that on the 16th day of the September term, 1901, of said court, the defendant in person and by attorney withdrew his plea of not guilty, theretofore entered in said cause, and filed plea in bar, which plea in bar being overruled, he re-entered his plea of not guilty to the indictment.   But defendant asserts that the clerk of the court, inadvertently wrote on the record the words "thereupon said defendant re-enters plea of not guilty in manner and form as charged in the indictment," and undertook to correct the record by motion supported by the affidavits of three different persons tending to show that the plea of not guilty as entered in the cause was entered by one of defendant's counsel, Boyle, and not by the defendant, or the court. The court, however, refused to make the correction, and in this, defendant insists, committed error.   Upon this question, the record, which imports absolute verity, is sought to be overcome, and shown to be false, by the affidavits of witnesses, in regard to which there can be no difference of opinion.   If the record entries of a court of record can be overcome in this way, then the truism that such records import absolute verity is a deception and a snare.

It is contended that the court erred in not furnish-

ing defendant a list of forty-seven competent and quali-
fied jurors, and in not sustaining defendant's challenge
to the jurors, Bahret, Rankin and Gibbons, on the
ground of their bias and prejudice against the defend-
ant.   But an examination of their *voir dire* examination
shows beyond any question that they were competent
to sit in judgment upon the case, and that the object-
ions to them were without merit.   Nor was there error
on the part of the court in excusing of its own motion
the venireman, Harry G. Moore.   This was a matter
resting in the discretion of the court, and in the absence
of some showing upon the part of defendant that he was
prejudiced thereby, he is in no condition to complain.

The assertion that defendant was not furnished
with a list of forty-seven qualified jurors from which
to make his challenges is therefore not sustained by the
record.

Upon the question of reasonable doubt the court in-
structed the jury that before they can convict the defend-
ant they must be satisfied of his guilt beyond a reason-
able doubt; such doubt, to authorize an acquittal upon
reasonable doubt, must be a substantial doubt of the
defendant's guilt, with a view to all the evidence in the
case, and not a mere possibility of the defendant's inno-
cence.   It is claimed that this instruction is erroneous
in that it did not tell the jury that if they entertained a
reasonable doubt they should acquit.   But this does
not seem to us to be a fair interpretation of the instruct-
ion, which says that "before the jury can convict the
defendant they must be satisfied of his guilt beyond a
reasonable doubt."   If, however, there be any question
as to the meaning of this instruction, by the eighth in-
struction the jury were told that, "As the law presumes
the defendant innocent, the burden of proving him
guilty rests with the State, and before you should con-
vict him his guilt must be established beyond a reason-
able doubt," thus presenting that phase of the case to
the jury in stronger and more explicit language than
presented by the refused instructions asked by defend-
ant upon the same question.   The question being fairly

presented by the instructions that were given, no error was committed in refusing other instructions covering the same question.

It is contended that the court erred in defining "deliberately" as being a cool state of the blood, not in a heat of passion, caused by some just or lawful cause of provocation to passion. There was in this case no evidence whatever of sudden passion, and, in such circumstance, it was held in State v. Ellis, 74 Mo. 207, that an instruction couched in substantially the same language, might well be given. [State v. Donnelly, 130 Mo. 642.]

There does not seem to have been any reversible error in the admission or exclusion of evidence to which objection was properly made and exceptions saved.

The question as to whether or not defendant was insane at the time of the commission of the homicide, was submitted to the jury by an instruction, to which no objection is made, and which seems to be in accord with the repeated rulings of this court. They found that defendant was sane, and it can not be said that there was no substantial evidence to sustain that finding. The murder was deliberately planned, and executed with a brutality seldom equaled, and if sane at the time, and the jury so found, defendant will not be heard to say that the penalty which the law exacts in such cases should not be borne by him.

We, therefore, affirm the judgment, and direct that the sentence pronounced by the law be executed. All concur.