## THE STATE v. HARRY N. BOBBST, Appellant.

Division Two, December 6, 1916.

1. **PRESENCE AT TRIAL: No Request.** In the absence of a request by defendant to be present in court on the day his case is set for trial, a verdict of guilty of murder will not be reversed because he was not present on that day.

2. **JUROR: No Challenge.** If the bill of exceptions fails to disclose a challenge of a juror, any challenge on appeal to the juror's qualifications will not be considered.

State v. Bobbst.

3. **FAIR PANEL: Opinion On Voir Dire: Subsequently a Witness: Fraud on Defendant's Rights.** Where a prospective juror on his *voir dire* stated he had not formed or expressed an opinion as to the sanity or insanity of defendant, and not being selected as one of the jury of twelve was produced as a witness for the State and testified that there was nothing to make him think defendant was "unsound," that he acted like an "ordinary man" and had "sufficient mind to know he would be punished if he killed his wife," there is no such discrepancy in his answers, in view of the questions asked, as authorizes a reversal, in a case in which the defense is insanity.

4. ———: ———: ———: ———: **Objection Too Late.** Besides, all the facts being known to defendant before verdict, the objection that said juror's conduct amounted to a fraud upon defendant's right to have a panel of forty fair and impartial men, came too late when raised for the first time in the motion for a new trial.

5. **INSTRUCTION: For Murder in Second Degree: Insanity as Defense.** Where if the State's evidence is to be believed defendant was guilty of murder in the first degree, and if defendant's is to be believed he was not guilty of any crime because of insanity, there is no error in refusing an instruction on murder in the second degree.

6. ———: **On Insanity: Assuming Defendant Killed Deceased.** Where the evidence that defendant killed his wife is strong and uncontradicted, instructions given on the defense of insanity which assume that he did kill his wife do not prejudice his rights, though it is better form for the instructions not to assume such fact.

7. ———: **That There Is No Evidence of Provocation.** Where the court defines "deliberately" as "done in a cool state of the blood, not in a sudden passion engendered by lawful or some just cause of provocation," it is not erroneous if the instruction goes further and tells the jury that there is no evidence tending to show such passion or provocation, if as a fact there is no evidence of sudden passion or provocation.

8. ———: ———: **Conflict With Davis Case.** And said instruction is in better form and more accurate than the one given in State v. Davis, 226 Mo. l. c. 515, wherein the words used were, "in a cool state of blood and not under violent passion suddenly aroused by some real or supposed grievance."

9. ———: **Drunkenness: Failure to Define: Insanity as Defense.** Where the defense is insanity and the instructions clearly distinguish between drunkenness and insanity, it is not error to fail to define the word "drunkenness" used in the instruction telling the jury that drunkenness is no defense to a criminal charge. Drunkenness alone, in any degree, will not relieve from the responsibility for crime.

10. ————: **Extra-Judicial Statements of Defendant: Caution.** Refusal
to give an instruction .which in effect cautions the jury as to the
weight they may give to any proven extra-judicial statements which
they may find defendant made concerning the circumstances attend-
ing the death of his wife, is not error, where it is undisputed that
defendant caused her death and there has been no such lapse of
time as would likely affect the memory of the witness.

11. ————: **Prior Insanity: Presumption of Continuance.** Where the evi-
dence shows no prior condition different from the defendant's ap-
parent condition at the time the homicide was committed, and
establishes not so clearly a prior condition of insanity as it does
a condition of moral degeneracy, superinduced by habits of bad
living, it is unnecessary for the court to instruct the jury that
if they find defendant prior to the homicide was in a habitual, per-
manent or chronic state of insanity, such condition is presumed
to continue, and the burden is on the State to repel and overcome
it.

Appeal from St. Charles Circuit Court.—*Hon. Edgar
B. Woolfolk,* Judge.

AFFIRMED.

*B. H. Dyer* and *Rosenberger & Dowell* for appellant.

(1) The action of the court in setting this cause
down for trial in the absence of the defendant necessi-
tates a reversal. State v. Warner, 165 Mo. 399. (2)
The court erred in assuming in the State's instructions
numbers one to fifteen inclusive that the defendant ad-
mitted the fact of having shot and killed his wife. (3)
In State's instruction number three the court erred in
its definition of the word "deliberately," and in fur-
ther instructing the jury that in this case there is no
evidence tending to show the existence of sudden pas-
sion engendered by lawful or some just cause of provo-
cation. (4) The court erred in not defining what was
meant by the word "drunkenness" as used in all the
instructions. (5) The court erred in refusing to give
to the jury defendant's instruction number P, being a
cautionary instruction on the question of statements
made by him. (6) The court erred in refusing to give
to the jury defendant's instruction on the presumption
of continued insanity. State v. Lowe, 93 Mo. 547:

State v. Wade, 161 Mo. 441; Buford v. Grueber, 223 Mo. 231.

*John T. Barker,* Attorney-General, and *Lee B. Ewing,* Assistant Attorney-General, for the State; *James P. Kem,* of counsel.

(1) The appellant cannot now complain because he was not present in the court room when his cause was set for trial, for the reason that he made no request to be present. State v. Miller, 191 Mo. 587; State v. Taylor, 171 Mo. 465.   (2) The court did not err in sustaining a peremptory challenge to juryman Hyppolyte Hunn, for no question as to the qualification of this juror can be raised in this court, as no proper challenge appears to have been made. State v. Taylor, 134 Mo. 109; State v. Allbright, 144 Mo. 638; State v. Dyer, 139 Mo. 199; State v. Evans, 161 Mo. 95; State v. Wooley, 216 Mo. 620.   The correct rule as to the qualification of jurors, as laid down by statute and in the decisions of this court, was followed by the trial court. Sec. 5220, R. S. 1909; State v. Cunningham, 100 Mo. 382; State v. Core, 70 Mo. 491; State v. Barton, 71 Mo. 288; State v. Farrow, 74 Mo. 531; State v. Sykes, 191 Mo. 62; State v. Myers, 198 Mo. 225; State v. Bobbitt, 215 Mo. 10; State v. Vickers, 209 Mo. 12.  · (3) There is nothing in the testimony or conduct of John Miller, as a juryman or as a witness, to justify the interference of this court. State v. Phillips, 117 Mo. 389; State v. Gonce, 87 Mo. 627; State v. Nocton, 121 Mo. 537.   (4) The court did not err in failing to instruct on murder in the second degree. State v. Harris, 177 S. W. 362; State v. Paulsgrove, 203 Mo. 193; State v. Wilson, 88 Mo. 15; State v. Ross, 24 Mo. 489; State v. Sassaman, 214 Mo. 695.   (5) The court did not err in failing to define the term "drunkenness" in its instructions.   (6) The court did not err in refusing to give defendant's instruction numbered "P."   State v. Henderson, 186 Mo. 473; State v. Floyd, 15 Mo. 349.

WILLIAMS, C.—Upon an indictment charging him with murder in the first degree for killing his wife, defendant was tried in the circuit court of St. Charles County, found guilty and his punishment assessed at imprisonment in the penitentiary for life. Defendant has duly appealed.

The killing occurred about 4:30 a. m., November 10, 1914, at the home of defendant's wife, in the city of St. Charles. For several months prior thereto defendant and his wife were living apart. She, together with her daughter Beulah, and a young man named Henry, a boarder, occupied a three-room house in St. Charles.

It appears that the police of St. Charles held a warrant for defendant's arrest for peace disturbance and for this reason he was living away from his family. Defendant's son, Eddie, thirteen years old, stayed with his father across the river most of the time.

Defendant had no regular occupation, but made a little money gathering rags and old junk. He was a strong drinker and spent most of his money in that way. Sometimes the neighbors across the river would give him something to eat and sometimes his wife would go across the river and take him something to eat and sometimes would take him whisky. Defendant, although he had no means of supporting his family, constantly demanded of them that they move across the river with him and he told many of his associates across the river that if his wife did not come and live with him he would kill her. In talking to others he would frequently charge his wife and daughters with being prostitutes and complain because the boarder, Henry, remained at the house, stating that he was attempting to ruin his youngest daughter Beulah. He also accused his wife of having other men come to her house. It appears that the wife was a hard-working woman of good character and that these charges were unfounded. About a week before the homicide, appellant and his wife were standing on the St. Charles bridge and defendant was urging his wife to go back

with him across the river.  She refused and defendant
attempted to throw her off the bridge.

The fifteen-year-old daughter was the only eye-wit-
ness to the homicide.  She testified that about one
o'clock a. m., on the night of the killing, defendant and
his son Eddie came to the door and knocked.  The de-
ceased opened the door and let them in.  Defendant
then began to quarrel with the deceased over the fact
that Mr. Henry was sleeping in an adjoining room with
the door not locked.  Defendant got in bed without
removing his clothing and it appeared that they quar-
reled more or less the remainder of the night.  The
defendant and his wife and the daughter Beulah and
the son Eddie all occupied the same room.  The de-
fendant was drinking, but was not drunk.  He drank
some whisky during the night, but did not threaten to
kill his wife that night.  He did ask his wife to leave
St. Charles and go away with him.

About 4:30 o'clock in the morning the daughter left
the room to prepare breakfast, and the deceased start-
ed to accompany her, but was held by defendant.
After the daughter left the room the defendant fas-
tened the door from the inside by sticking his knife in
the jamb.  The deceased was heard to tell the defend-
ant that she wanted to get breakfast, because she
"wanted to go to work for Bushman's," and the de-
fendant replied that she "would not see Bushman's
any more."  About five minutes after the daughter
left the room, she heard a shot and heard her mother
scream.  She immediately rushed back into the room.
She reached the room just as the second shot was fired.
She saw the defendant with one arm around the de-
ceased, with a pistol in his hand pointed at the de-
ceased.  Defendant said nothing, but was gritting his
teeth and pulling the trigger of the pistol.  He fired
five shots in all.  The daughter grabbed the pistol and
received one shot in her arm and leg.  In the struggle
that ensued the defendant received a wound from one
of the bullets.  The waist of the deceased was on fire
and she took a few steps and fell.  The defendant ran

from the room, and in a short time, Henry, the boarder, ran out after him. Defendant went immediately to the home of his daughter and son-in-law and said to his daughter, "I want to get away. I don't want to die in this hole."

Shortly after this the defendant was found by the police under the floor of his son-in-law's house. He was brought out and placed under arrest. He had about a pint of whisky and three or four cartridges. At the time of his arrest, the son Eddie said to the defendant: "Pa, I told you to leave that damn gun at home; if you had you would not be in this trouble. I told you to leave it at home and you paid no attention to me." A short time after the defendant was arrested he told his son-in-law that if he (the son-in-law) had not kept the deceased from coming across the river, "possibly it would never have happened."

The wife was taken to the hospital, but died in a few hours from the effects of the bullet wounds. A short time before her death she stated to the people attending her that she had been shot by her husband; and before she was taken to the hospital and while she was at her home, she reached under her pillow and took out a pistol and said that was the gun the defendant used in shooting her. She handed this pistol to the doctor. It was identified and introduced in evidence at the trial.

The attending physician testified that there were three bullet wounds on the deceased's body and that death was due to an internal hemorrhage caused by the bullet wounds.

The evidence on the part of the defense did not undertake to deny the killing, but tended to show that appellant was insane at the time the act was committed. The evidence in this regard tended to show that defendant's father "was never considered very bright" and was peculiar; that defendant's mother thirty-five years ago took to her bed because her husband would not build the kind of a house she wanted and had remained in bed ever since; that defendant

had been guilty of petty thievery all his life and had associated with negroes and was frequently seen drinking alcohol and other liquor in alleys and saloons. The children in St. Charles called him "Oats," because it was rumored that at one time he sold oats and put sand in them. In reply to this epithet he would run after children with a club. Some of the witnesses testified that he looked like a "tough" man; that he would stand around the street apparently "not caring whether he stayed in this world or not;" that he quarreled with his bed-ridden mother and would talk to himself and cry and walk around at night; that he was a heavy drinker; that he wrongfully accused his wife of being intimate with other men. About ten non-expert witnesses testified that in their opinion he was insane or a person of unsound mind and could not distinguish between right and wrong.

Dr. J. O. Hudson, of Montgomery City, Missouri, testified that he had known the Bobbst family since 1877 and that in that year he was called to see defendant's mother, who had been in bed several years; that he advised that she be taken out of bed and into the yard, and that after lying outside a while she went back into the house and went to bed again and has been there ever since; that defendant's father was a man of low mental caliber, filthy, of low morals and a kleptomaniac; that the defendant was a moral degenerate; that he associated with negroes; became intoxicated and had the reputation of being a thief; that during the summer previous to the tragedy defendant came to his house at Montgomery City and told him all of his daughters were prostitutes, and cried and became hysterical, After this occurred, defendant's wife brought defendant to the doctor's office, at Montgomery City, for consultation; that upon examining defendant he found him very nervous and that while examining him he had a convulsion and could not talk for awhile. The doctor said that it was a form of insanity and advised that defendant be taken where he could get proper diet. The doctor further testified

.that, in his opinion, the defendant did not have suffi-
cient mind to distinguish between right and wrong.
Two other physicians examined appellant while he was
awaiting trial and gave it as their opinion that his
mind was unsound and that he was not able to distin-
guish right from wrong.

In rebuttal the State offered evidence tending to
show defendant's sanity. Dr. Strumberg examined the
defendant while he was in jail and gave it as his opin-
ion that the defendant had sufficient mind to know
right from wrong. In addition to this the State called
over forty non-expert witnesses, persons who had
known him before and up to the time of the tragedy,
all of whom testified that in their opinion appellant
had sufficient mind to know right from wrong and to
know that he would be punished if he killed a person.
One witness said he was "shrewd and foxy in his deal-
ings;" another, that he never saw anything peculiar
about him; and another that he was "anything else but
crazy."

I. It is contended that the case must be reversed be-
cause the defendant was not present in court on March
2, 1915, when the case was set for trial. We are un-
able to agree with this contention. In the case of
State v. Warner, 165 Mo. 399, relied upon

**Absence of Defendant.** by appellant, the court *refused the defend-
ant's request* to be present in court for the
purpose of challenging the array of grand jurors, and
for that reason, the case was reversed. In the later
cases of State v. Taylor, 171 Mo. 465, and State v.
Miller, 191 Mo. 587, it was expressly held that if the
defendant failed to request permission to be present
to challenge the array of grand jurors his absence
should not work a reversal of the case. In the pres-
ent case defendant made no request to be present when
the trial date was fixed. Applying the same logic here,
and assuming that the presence of defendant upon the
fixing of the trial day is a matter of as much impor-
tance as is his presence upon the day the grand jurors

are impaneled (a matter we need not here determine),
yet the absence of defendant, absent a request to be
present, would not work a reversal of the case. [State
v. Miller, supra, and cases therein cited.]

II. It is contended that the court erred in not sus-
taining defendant's challenge to juror Hyppolyte Hunn.
This point must be ruled against appellant
Challenge
of Juror. because the bill of exceptions does not dis-
close that such a challenge was made.  In
the absence of a challenge, specifying the grounds
therefor, the matter is not for review. [State v. Dip-
ley, 242 Mo. 461, l. c. 474, and cases therein cited.]

III. When the panel of forty were being examined,
John Miller, one of the prospective jurors, in response
to questions asked him, stated that he had known de-
fendant for several years, but that from his
Fair
Panel. acquaintanceship and observation of defendant
he had not formed an opinion as to the sanity
or insanity of the defendant.  Miller was not selected
as one of the jury of twelve, but later upon the trial
he was offered as a witness by the State and testified
that from his observation of defendant there was noth-
ing to make the witness think that defendant was "un-
sound;" that he acted like an "ordinary man" and
that he had "sufficient mind to know that he would be
punished if he killed his wife."

Defendant insists that the conduct of this prospec-
tive juror amounted to a fraud upon defendant's rights
to have a panel of forty fair and impartial men from
which to select the jury.

We are inclined to the view that the discrepancy
between this witness's testimony as a prospective ju-
ror and later as a State's witness was due, not to an
intentional effort to deceive, but rather to a misunder-
standing of, or the difference in, the questions asked.
If, as the witness later testified, he had observed noth-
ing peculiar in defendant's actions during his ac-
quaintanceship with him, it is quite probable that he

had never formed an opinion as to the defendant's sanity or insanity.

S⁺rictly speaking it is not the common experience to form opinions as to the insanity of associates and acquaintances unless peculiarities are discovered which lead the observer to suspect unsoundness. Neither is it the common experience to consciously form opinions as to the sanity of acquaintances until the sanity of such a person is put in question or the observer is called upon to give an opinion. There is nothing in this record to indicate but what the witness, had he been asked the same questions upon his *voir dire* as were later put to him as a witness, would have made the same answers.

The matter carefully considered, we do not regard the situation as one calling for an interference by this court. Furthermore, all the facts were known to defendant before verdict, but he failed to raise the point by proper motion or objection timely made upon discovery and before verdict. Under such circumstances the objection comes too late when raised for the first time in the motion for a new trial. [State v. Phillips, 117 Mo. 389, l. c. 394.]

IV. The court did not err in refusing an instruction on murder in the second degree. If the State's evidence is to be believed, defendant was guilty of murder in the first degree. If the defendant's evidence is to be believed, the defendant was not guilty of any crime because of insanity. There was no evidence to support the theory of murder in the second degree. [State v. Paulsgrove, 203 Mo. 193, l. c. 206.]

Murder in Second Degree.

V. We do not find merit in appellant's contention that the court committed reversible error because some of the instructions given on the defense of insanity

assume that the defendant killed his wife. That de-
fendant did kill his wife cannot be said
**Instructions on Insanity.** to be a really controvertible issue under the
facts here disclosed. And although, techni-
cally speaking, it was probably bad form to assume
such fact in said instructions, yet it cannot be said, in
view of the strong, uncontradicted evidence of such
killing, that the rights of appellant were in any manner
prejudiced thereby.

The court defined the word "deliberately" as
"done in a cool state of the blood, not in a sudden
passion engendered by lawful or some just cause of
provocation" and further instructed the jury that
**Provocation.** there was no evidence tending to show such
passion or provocation. This identical form
of instruction was in the case of State v. Ellis, 74 Mo.
207, l. c. 220, stated as the correct form to be given
where there is no evidence of such sudden passion or
provocation. There was no evidence of this kind in the
case at bar. To the same effect are State v. Donnelly,
130 Mo. 642, l. c. 647; State v. Taylor, 171 Mo. 465,
l. c. 477, and State v. David, 131 Mo. 380, l. c. 395.

Appellant contends that the above quoted portion of
the definition conflicts with the one given in State v.
Davis, 226 Mo. 493, l. c. 515, to-wit, "in a cool state of
blood and not under violent passion suddenly aroused
by some real or supposed grievance." It is true that the
wording of these two instructions is somewhat different,
but there appears to be but little difference in the mean-
ing conveyed. If it can be said that there is any ma-
terial difference in the meaning of quoted portions of
the two definitions, it appears that the definition given
by the court of his own motion in the case at bar is
somewhat wider in scope and therefore of benefit
rather than detriment to the defendant. We are in-
clined to the opinion that the instruction complained of
is in better form and more accurate than the one
quoted in State v. Davis, supra, and that the court did
not err in giving the same.

269 Mo.—15

VI. It is insisted that the court erred in failing to define the term ''drunkenness,'' as used in the instructions given on the proposition that drunkenness is no defense to a criminal charge. We are unable to agree with this contention. The instructions given on this proposition fully covered the subject and were in form often approved. Drunkenness and insanity were clearly and correctly distinguished by these instructions and further definition or explanation of the term drunkenness was unnecessary. It is suggested by appellant that the term drunkenness might suggest to the different jurors different degrees of intoxication. Even if this were true, it would not result in injury to appellant, because drunkenness alone, in any degree, would not relieve appellant from responsibility for the crime.

**Drunkenness.**

VII. We must disallow the contention that the court erred in refusing to give appellant's instruction ''P,'' which in effect cautioned the jury as to the weight they should give to any proven extrajudicial statements which the jury might find the defendant had made concerning the circumstances attending the death of his wife.

**Extra-judicial Statements.**

In the case of State v. Moxley, 102 Mo. 374, l. c. 390, cited and relied upon by appellant, the cause of the death and the identity of the criminal agent, if any, were contested issues relying wholly upon circumstantial evidence for their proof. Furthermore, the alleged statements of defendant in that case occurred about four years before they were detailed in evidence at the trial. Under those circumstances the instruction was undoubtedly proper. But in the case at bar there is no dispute as to the cause of the death or as to the person causing the same. Neither did such lapse of time intervene as would likely affect the memory of the witness, nor were there other circumstances making necessary such an instruction. [State v. Henderson, 186 Mo. 473.]

VIII. Error is assigned upon the court's refusal to give the following instruction asked by appellant, to-wit:

"The court instructs the jury that if you find and believe from the evidence that for some time prior to November 10, 1914, the defendant was in a habitual, permanent, or chronic state of insanity, then and in that case the presumption of the law that the defendant was sane and of sound mind at the time he shot his wife, is removed and repelled and the law presumes that such insanity continued up to and existed at the time he shot his wife, and the defendant is not required to prove he was insane or of unsound mind at the time he shot his wife, but it devolves upon the State, in that case, to prove that at the time defendant shot his wife, he was sane and of sound mind as explained and defined in the other instructions."

*Insanity.*

Appellant cites State v. Lowe, 93 Mo. 547, in support of this proposition. In that case the evidence clearly established the prior existence of habitual insanity for many years preceding the defendant's removal from Kentucky to Missouri some three years prior to the homicide, and it was properly held that under those facts the instruction as to the presumption of continued insanity should have been given.

The case at bar presents a very different situation. Here the evidence does not show any prior condition different from the apparent condition at the time the act was committed, and establishes not so clearly a prior condition of insanity as much as it does a condition of moral degeneracy, superinduced by his bad habits of living.

The evidence does not prove a prior existing insanity any more clearly than it proves that defendant was insane at the time of the act. Under such a state of facts, we are unable to discover the necessity of an instruction of this kind. Here the question of insanity was one to be determined, not from a presumption springing from a clearly proven prior condition of in-

sanity, but one, which if found to exist would in all probability require a consideration of all the facts and circumstances detailed in evidence down to the very time of the act.

A portion of the distinction here attempted is, we think, very analogous to the one made in the case of State v. Palmer, 161 Mo. 152. The point is ruled against appellant's contention. The judgment is affirmed. *Roy, C.,* concurs.

PER CURIAM:—The foregoing opinion by WIL-LIAMS, C., is adopted as the opinion of the court. All of the judges concur.