THE STATE v. EMMETT BARTLEY, Appellant.—84 S. W. (2d) 637.

Division Two, July 10, 1935.

*Clayton W. Allen* and *Clark H. Gore* for appellant.

*Roy McKittrick,* Attorney General, *Wm. Orr Sawyers,* Assistant Attorney General, and *Lee Mullins* for respondent.

WESTHUES, C.—Appellant was found guilty of murder in the second degree and received a sentence of thirty years' imprisonment in the penitentiary, from which sentence he has appealed. On January 24, 1933, the prosecuting attorney of Atchison County, Missouri, filed an information in the circuit court of said county charging appellant with murder in the first degree in that on the sixteenth day of January, 1933, he shot and killed his son, Wilburn Bartley.

Appellant was first tried upon this charge in Atchison County and found guilty of murder in the second degree. His punishment was fixed at twenty-five years' imprisonment in the penitentiary. The trial court granted appellant a new trial. Thereafter the venue was changed, on application of appellant, to Nodaway County where he was again tried and found guilty as above stated.

At the time of the tragedy here in question, appellant and his family lived in a covered wagon and a small house on a farm in Atchison County. Some members of the family slept in the wagon and others in the house. Appellant and his family often traveled from place to place in the covered wagon, making a living by trading horses.

The State's evidence in support of the charge reveals the following state of facts: On Monday morning, January 16, 1933, appellant instructed his son William, who was about thirteen years of age, to do the chores and to awaken Wilburn, saying: ''Tell that big boy to get up,'' meaning Wilburn, who was sleeping in the small shack. Appellant and William had slept in the covered wagon. When Wilburn was awakened he arose, dressed and went to the wagon, which was standing a short distance from the house. When Wilburn reached a point within a few feet of the wagon he was shot in the chest and killed with a load of shot discharged from a shotgun in the hands of appellant. The State's evidence further disclosed that Wilburn was a strong, healthy man, about eighteen years of age; that the father, appellant, had made numerous threats against this son, many of these threats being that he was going to kill the boy because he was always making trouble at home. It was shown that Wilburn had been away from home for about two years and had returned only a few weeks prior to the homicide. The State also offered evidence of alleged statements made by appellant after the homicide, which tended to incriminate him. Note the following evidence given by a witness for the State:

''Q. State whether or not you called on him or made a visit to him while he was in jail over at Rock Port? A. Yes, sir, I did.

''Q. And whether you had any conversation with him or not concerning the death of his boy? A. I did.

234

"Q. Will you tell the Court and jury what that was? A. Well, he said—I just went in to see him that night, and he said 'Okey, I am in a mess,' he said, 'I was drinking,' he said, 'This boy came up to the front of the wagon, and I killed him.' He said, 'The old lady and I had been having—' or 'the old lady,' he said, 'The old lady and I have been having hell.' He said, 'When I saw what I had done,' he said, 'I just got back in the wagon and drank the rest of my whisky so I would be good and drunk when they came after me.'"

Appellant's sole defense was that the shooting was accidental. Appellant testified that he was in the habit of having a loaded shotgun near his bed at night. He further testified as follows:

"A. Well, I got up, and when I got up my leg was hurting pretty bad, and I told Billy to go call the other boy to do the chores, I was going to get Floyd to take me to Hamburg to a doctor up there, and I said, 'I will straighten up the wagon.' The night before the boys had got in some chips and kindling, and I got up and started a little fire in this camp, stove, and Billy went on. I heard him holler to the other boy and call him, and in the meantime the grate fell down out of this stove, and I got that straightened up, and the fire started, and I went to straightening up the wagon, and I picked up the gun to unload it, and put the gun up where I kept it in the daytime so the kids wouldn't get hold of it, and I was holding the gun in my left hand like this (illustrating) and I went to break it. I was standing on my left foot—

"Q. Just stand right up there and show us how you were standing. A. Standing like this on one foot, and when I went to break this gun down like that, the wagon tipped over this way to the west side, the southwest side, and that threw me off balance, and I started to fall, the gun went off, and I don't know now whether it caught on my mackinaw there—I had two or three holes in the side of my mackinaw. I don't know how it happened, but as soon as I started to fall, the gun went off, and I heard something hit the doubletrees, and I looked out, and there laid this boy."

Appellant denied having made any threats against deceased, as testified to by a number of witnesses for the State. He also denied having made the incriminating statements attributed to him. It was shown by the evidence that appellant, shortly after the homicide and when the officers arrived, was intoxicated to such an extent that he was helpless and practically unconscious. Appellant's explanation of his condition reads as follows:

"A. Well, just then the woman came running out of the house, and the boy was laying there, and the little boy came running up, and the woman got hold of him here and the little boy got ahold of his feet, and I got out of the wagon as quick as I could, and taken him in and lay him on the bed.

"Q. Tell us what happened then, Mr. Bartley. A. I examined him and seen he was dead (witness cries) and I turned around and went back out to the wagon, and had almost a pint of whisky under the mattress, and I got that and drank it all, and in two or three minutes I just passed out."

Appellant's motion for a new trial contains thirty-two assignments of error. A number of these assignments are too indefinite to raise any question for our review. Error was assigned to the action of the trial court in refusing to sustain appellant's motion to quash the information, also a plea in abatement and a motion to suppress certain evidence. The two motions and plea were all embodied in one verified pleading and were all based upon the same allegations. These allegations, as contained in appellant's pleading, were in substance that the wife of appellant had been subpoenaed to appear at a hearing before a coroner's inquest and there compelled to testify without the consent of appellant. It was also alleged that the wife of appellant was called before a grand jury on the sixth day of September, 1933, and compelled to testify, without the knowledge or consent of appellant, to facts concerning the homicide here in question. The State filed a demurrer to appellant's pleading, which was sustained by the trial court.

The motion and plea alleged that the action on part of the State in compelling the wife of appellant to testify, both before the coroner's inquest and before the grand jury, was in violation of Section 3692, Revised Statutes 1929 (Mo. Stat. Ann., p. 3242), and in violation of Section 23, Article 2, of the Constitution of Missouri. We need not enter upon a lengthy discussion of the points urged by appellant for the following reasons: It will be noted that the information, charging appellant with the crime of murder, was filed on January 24, 1933, more than seven months before appellant alleges that his wife was called before the grand jury. So far as the record in this case discloses no mention was made of any grand jury proceedings, except in appellant's motion. Appellant's wife did not testify at the trial, nor was she called or offered as a witness. If she testified before the grand jury and at the coroner's inquest it was not referred to during the trial of the case, nor was any evidence which she may have given referred to. A coroner's inquest is not a part of a criminal prosecution, whether the prosecution be by indictment or information. The prosecution in this case was instituted by an information and not by an indictment. Appellant entered a plea of not guilty to this charge. No mention was made of any preliminary hearing. It must, therefore, be presumed that a preliminary hearing was had and that the prosecuting attorney was authorized to file an information.

Assuming, therefore, the allegations contained in appellant's pleading as true, the trial court rightly refused to abate the prosecution

and to .quash the information. The State did not attempt to offer any evidence of statements made by the wife of appellant before the grand jury or before the coroner's inquest. No question is, therefore, presented on the point of suppressing the evidence obtained before the coroner or the grand jury.

■ The sufficiency of the evidence to sustain the charge was questioned in the motion for new trial. But without discussing the point we hold that the evidence, above stated, was ample to support the verdict of the jury.

■ Instructions Nos. 3 and 5, offered by appellant and refused by the trial court, were cautionary instructions. By Instruction No. 3 appellant sought to have the court instruct the jury that circumstantial evidence should always be considered cautiously; by Instruction No. 5, that evidence of alleged declarations of the defendant should be received by the jury with great caution. The substance of both instructions would be proper argument to a jury, by counsel for appellant, but in this case the court was not required, under the law, to give such instructions. A proper circumstantial evidence instruction was given. Also one on reasonable doubt and another on the credibility of witnesses. That was sufficient for the guidance of the jury. We have recently held instructions erroneous, which informed the jury that any statements, made by a defendant against himself and proven by the State, were presumed to be true on the theory that such instructions invaded the province of the jury. [State v. Johnson, 63 S. W. (2d) 1000, 333 Mo. 1008, and State v. Duncan, 336 Mo. 600, 80 S. W. (2d) 147, l. c. 153 (15).] By the same rule, an instruction, such as number five offered by appellant, should not be given.

■ Next appellant complains because the trial court refused to give an instruction submitting appellant's defense to the jury. Appellant offered an instruction in substance telling the jury that if they found and believed from the evidence that the shooting of deceased was an accident then they should acquit appellant. Appellant's evidence justified such an instruction and he was entitled to have his defense submitted to the jury. No instruction was given covering this defense. We have repeatedly held that a defendant is entitled to have his defense submitted to the jury by instructions, be his defense an alibi, self-defense, or as in this case that the killing was an accident. [State v. Markel, 77 S W. (2d) 112, l. c. 115 (6, 7); State v. Ledbetter, 332 Mo. 225, 58 S. W. (2d) 453, l. c. 454 (3); State v. Gillum, 336 Mo. 69, 77 S. W. (2d) 110; State v. Stewart, 29 S. W. (2d) 120, l. c. 123 (4, 5); State v. Gurnee, 309 Mo. 6, 274 S. W. 58, l. c. 61 (6, 7).]

In the Ledbetter and Gurnee cases it was held that such instructions must be submitted in proper form. In the case now before us the court gave a manslaughter instruction. If this instruction was au-

thorized then of course appellant's instruction was not in proper form, because even if the killing of deceased was an accident appellant could still have been convicted of manslaughter as noted in the Markel case, supra. We are of the opinion, however, that in this case a manslaughter instruction was not authorized by the evidence. Under the State's theory of the case appellant was guilty of murder. If appellant's version of the case was correct then he was not guilty even of manslaughter. There was no evidence that the breaking of a shotgun for the purpose of removing the shell was attended with any particular danger, or that appellant handled the gun in a reckless and careless way. Appellant testified that the wagon careened and that he lost his balance and in some way, unknown to him, the gun caught in his clothing causing it to discharge. It may be noted that two juries have found appellant guilty of murder in the second degree and have disbelieved appellant's version of the case. Upon a retrial, if the evidence be substantially the same, a manslaughter instruction should not be given. If appellant should request an instruction in proper form on the accident theory it should be given.

Other instructions, offered by appellant and refused by the trial court, have been examined and compared with instructions given by the court. We find that the subject matter of these refused instructions was fully covered by the instructions given. Therefore, no error was committed in refusing to give the instructions offered by appellant. The correctness of the instructions submitting murder in the first and second degrees was questioned in the motion for new trial. We have examined them and found them to be in approved form.

An instruction on drunkenness was given by the trial court, which was objected to by appellant on the theory that he, appellant, was not intoxicated at the time of the homicide and did not plead drunkenness as a defense. It is apparent from the evidence that appellant was not intoxicated at the time of the homicide to the extent of being helpless. When the officers arrived he was in such a condition. There was evidence, however, from which the jury was authorized to find that appellant had been drinking prior to the homicide. The instruction given told the jury that voluntary drunkenness "cannot justify, excuse or mitigate the commission of a crime, and the fact, if it be a fact, that defendant may have been drunk to any degree at the time of the killing cannot be taken into consideration by the jury in making up their verdict." The instruction was a correct declaration of the law and was authorized by the evidence. Such has been the ruling of this and many other courts. [See 16 C. J. 104, sec. 81, also 29 C. J. 1056, sec. 20, and numerous cases cited to the text; also State v. Bobbst, 269 Mo. 214, 190 S. W. 257, l. c. 261 (8, 9);

State v. Harlow, 21 Mo. 446; State v. Brown, 181 Mo. 192, 79 S. W. 1111, l. c. 1115.]

The State offered evidence tending to prove that the wife of appellant did not visit appellant while he was confined in jail awaiting trial. Such fact, if it was a fact, was not competent evidence against appellant, irrespective of the reason the wife may have had for not making any visits. This point was referred to in the motion for a new trial, but we are doubtful if in the trial of the case the point was preserved for our review. We mention it for the guidance of the trial court upon a retrial of the case. The conduct of the wife towards her husband should not be proven against him. [40 Cyc. 2213 (b); State v. Burlingame, 146 Mo. 207, 48 S. W. 72.] Other assignments made, not briefed, have been examined and found to be without merit.

The judgment is reversed and the cause remanded for trial. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.