**STATE of Missouri, Respondent,**

v.

**John A. BOZARTH, Appellant.**

No. 49171.

Supreme Court of Missouri,

Division No. 1.

Nov. 14, 1962.

---◆---

Taken as submitted by appellant.

Thomas F. Eagleton, Atty. Gen., James W. Steele, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

DALTON, Presiding Judge.

■ Defendant was charged with murder in the first degree in an information filed in the Circuit Court of Daviess County on October 23, 1959. Thereafter, the cause went on change of venue to Caldwell County, where, after change of judge, the cause was tried to a jury before Honorable Frank D. Connett of the Fifth Judicial Circuit, sitting as special judge. On June 29, 1961, the jury returned a verdict finding defendant guilty of manslaughter, but was unable to agree on the punishment. Thereafter the court assessed defendant's punishment at ten years' imprisonment, and he was committed to the Department of Corrections at Jefferson City, Missouri. Defendant has appealed, but has not favored us with a brief, hence we shall examine such assignments of his motion for a new trial as are sufficient to meet the requirements of Supreme Court Rule No. 27.20, V.A.M.R.

■ Defendant offered a motion for judgment of acquittal at the close of all the evidence, which motion was overruled. While the action of the court in this regard is not assigned as error in the motion for a new trial, a brief statement of the evidence is essential to an understanding of certain assignments of error contained in the motion for a new trial.

Defendant was charged with the murder of Millard F. Cain on August 12, 1959, in Daviess County. It was the State's theory that defendant suspected Cain of having stolen a shotgun from him; that he induced Cain to visit defendant's cabin for a drink of wine and there beat him with a hammer. The injuries sustained, however, did not result in death until August 16, 1959. The State waived the death penalty.

On August 12, 1959, defendant was living in a cabin on the west side of Highway 69 at the east edge of Pattonsburg, Missouri. He had rented the cabin from one Warford about August 1 of that year. The cabin in question was one of a group of four or five small cabins known as the Elms cabins. These cabins, apparently in bad repair, had been rented in connection with a service station, which was no longer in operation. Defendant's cabin consisted of two rooms, a closet and a "cubbyhole" that was formerly built for, or used as, a shower stall. Entrance to the cabin was from the north into a large room, with a smaller room immediately south, and to the left of the south room was a smaller room, or closet, which measured five or six feet by four feet, and to the east of this was the small "cubbyhole." Some evidence showed it to be only about two feet wide. On the date mentioned defendant was fifty-nine years of age, five feet eleven inches tall and weighed approximately 160 pounds. In the past he had worked at various types of labor, but was then working for the MFA, hauling cobs. He was in the habit of drinking wine to excess and, after his character was in issue, the State showed that his reputation for turbulence and violence was bad.

The deceased, referred to as Millard "Petey" Cain, was sixty-nine years of age, about five feet six inches tall and weighed approximately 135 to 140 pounds. He was a farm laborer and fisherman and was referred to as "an alcoholic and wino" and also as "one of the town drunks." There was evidence that frequently, when drunk, he would go to the Elms cabins and "sleep it off."

On the issue of motive, the State's evidence showed that defendant stated he had caught "Petey" Cain pilfering around in his cabin a week or so prior to the date in question; that Cain "had stole a shotgun off him and he was laying for him to catch him in there." He said the shotgun belonged to Warford's son. Defendant also testified that he had run into "Petey" Cain on August 11, 1959, about 100 yards down the highway from Lambert's Liquor Store. It was clear from defendant's evidence that defendant suspected Cain of the theft, since defendant testified as follows: "Q What happened then? A He said: 'Where are you going?' and I said, 'Home'. Q Was there any other conversation? A We got on down there and he said: 'I heard you had a gun stolen', and I said, 'How did you know?', and he said: 'Norman said he thought he heard you talking about it up in front of Grahams', and I said: 'I want to find it if I can.' He said: 'There has been a lot of stuff stolen', and I said: 'Yes, and I don't want no one laying around there drinking like it has been, because I have the whole place rented now.' Q You wanted him to stay away? A Yes."

The record also shows that defendant had borrowed the hammer used in the beating from a Mr. Shipers, who worked for the MFA, and that he had borrowed it on Friday before the killing on Wednesday. Defendant told Robert Smith (defendant's witness) that Cain had been around, and he wouldn't say that Cain stole the shotgun, but "he wasn't above stealing it" and that he (defendant) would have to pay $125 to Lyle Warford. On the date in question, August 12, 1959, one Walker took defendant to Lambert's Liquor Store about dark. Lambert testified that he sold defendant a pint of wine from his liquor store. He said defendant arrived at the store about nine o'clock and stayed at the store until closing time, about 10 p. m. At that time defendant was not intoxicated and appeared to be in a normal condition. He did not open the wine while at Lambert's place. The store is located on Highway 69, a quarter of a mile north of Pattonsburg. The defendant left on foot.

Woodrow Morris, the operator of a service station on Highway 69 about one block north of the Elms cabins, saw the defendant and Cain together at about five minutes past ten on the night of Wednesday, August 12, 1959. They were going south on foot. There was a street light by Morris' place of business that lighted the area so that he could see both of them plainly in the lighted area. The two men were coming down the road together from north of his place. He had first seen them across the highway and about 200 feet or so north. After they came closer he saw it was defendant and Cain. Cain was on Morris' side of the highway going south and defendant stayed on the east side going south. They walked down as far as the front of Morris' place and past there to the intersection and Cain stopped at the intersection and lit a cigarette. They were then only a block from the Elms cabins. The only conversation they had was when defendant asked Cain if he had had a drink and Cain said "No", "I've quit—clear quit." Defendant kept walking and then asked the same question again and got the same answer. After they passed, defendant walked across the highway to Cain and they walked on together on the west side of the street, going south in the direction of the Elms cabins. Morris observed nothing after that except the light in the defendant's cabin, but he did not know defendant lived there at that time. The witness had never seen defendant and Cain together on any previous occasion. Defendant was half way down the block to the south when Cain met up with him. The city park takes up nearly all of the block, except what is occupied by these old cabins and an old filling station. A Mr. Woodring, who was mowing in the city park, saw Mr. Cain about 9:30 p. m. coming from a westerly direction, going east, and waved at him. He appeared normal.

Cain's son also testified that, on the evening of August 12, 1959, Cain left the son's residence about 10 p. m. It was then dark.

His father had been drinking but was not drunk, only about half intoxicated. Defendant's cabin was about one block from the home of Cain's son. When Cain left, he went down the alley and through the park in the direction of the Elms cabins. In addition to hunting and fishing, and doing farm work, the deceased also drew a small pension.

At approximately 10:15 to 10:30 on the night of August 12, 1959, defendant went to the home of Sam Graham and requested that he call an undertaker as there was a dead man in his cabin. Mr. Graham called Dr. Baumgardner, Coroner of Daviess County. Dr. Baumgardner proceeded to the Elms cabin where he found the defendant and defendant showed him where Millard "Petey" Cain was lying. Cain was unconscious, but alive. Dr. Baumgardner then left Cain and defendant, and went and called the marshal and an undertaker. They all arrived back at the cabin at approximately the same time, and Cain was removed to the Noll Memorial Hospital at Bethany, Missouri, by ambulance. Defendant was left alone in the cabin. Baumgardner and the city marshall, Ladd, found Cain lying on his back, with his head in the northwest corner of the shower stall and his legs and feet extending out into the closet. There was nothing in his hands. There was no box in the "cubbyhole" or closet where Cain was lying. It was most difficult to remove the body from the shower stall or "cubbyhole" due to the smallness of the space and the cramped position of the body. Cain's head was very bloody, his injuries were very recent, and there was much blood on the floor and walls of the room that "takes you into the little closet." At the time the body was removed from the shower stall, Dr. Baumgardner did not notice anything in the place from which Cain's body was removed; however, he saw a box of dynamite sitting alongside of a suitcase at another place in the cabin. Mr. Robertson, the undertaker, did not see anything on the floor of the shower stall when Cain was removed. At the time the undertaker,

coroner and the city marshal were removing Cain from the cabin, the defendant showed them the hammer in question and they observed blood on it. Subsequently the sheriff was called and went to the cabin and found defendant, who picked up the hammer and said, "This is the hammer." It was a claw hammer. Subsequently, the same night the marshal, the sheriff and the prosecuting attorney returned to the scene and found defendant alone. At that time there was a box of dynamite in the corner from which Cain's body had been taken. An examination of the box revealed no blood on it except for a spot on the bottom. This box was about four inches deep, twelve to sixteen inches wide and two feet long, and contained dynamite. Defendant said it had been in the corner all of the time; however, Ladd, like Baumgardner and Robertson, had not seen the dynamite in the shower stall at any time until their return after Cain had been removed. At the time defendant requested Mr. Graham to call the undertaker defendant was staggering and Mr. Graham smelled alcohol and thought defendant was drunk, but he talked intelligently. Ladd, the marshal, testified that defendant had been drinking, while Sheriff Houghton stated that defendant was nervous and had been drinking, but he would not say he was drunk.

When defendant asked Mr. Graham to call an undertaker he told Graham he found Millard "Petey" Cain in his house and he had "popped him." He told Dr. Baumgardner he had caught Cain in the cabin and "worked him over with a hammer." He told the city marshal, Ladd, that he caught "Petey" Cain pilfering around and knocked him in the head with his hammer. Defendant also told Ladd that "he had the hammer to beat up Pete Cain if he caught him in his home there." He told the sheriff he had caught Cain in his cabin and "clobbered him." Later he told the sheriff "I went home, unlocked the cabin and heard a noise back in the back there. That hammer was laying on the table in the front room, I got it and went back in there and caught

Petey Cain down on his knees over that box of dynamite" and "I clobbered him with it." After he was arrested and the sheriff was taking him to Gallatin to jail, he told the sheriff that he (defendant) "wanted to kill him (Cain) and I hope the son-of-a-bitch dies." Later he told the sheriff that "he had hit Cain with the flat side of a hammer, that Cain had fell over face up and he hit him in the face" and that he hit Cain twice. When defendant learned that Cain had died he stated to the sheriff that Cain did not have a weapon and that he did not hit Cain in self defense. When he was on his way to jail he told Lois Brown he had killed Millard Cain.

Albert F. Nibbe, M. D., examined Cain on the night of August 12, 1959 and, when he examined him, Cain was unconscious and in a light coma and there were lacerations of the scalp over the anterior portion of the scalp with abrasions of the right shoulder and some superficial abrasions and lacerations on the face and on the hand. Four or five areas of the scalp required suturing. There were approximately twelve or fourteen marks on the head and shoulders and the lacerations on Cain's head were of a double-type lacerations. Cain died about 4 p. m. on August 16, 1959, and it was the doctor's opinion that Cain died of intercranial hemorrhage, which occurred secondary to skull fracture and a penetrating wound of the skull. The X-rays of the skull indicated an extensive fracture. The doctor was of the opinion that the damage to Cain's skull was apparently caused by multiple blows from a sharp instrument, as opposed to a blunt instrument, although he further stated that it was his opinion that the wounds could have been caused from the claw end of a claw hammer; that from an examination of the wounds he could not state whether Cain was assaulted from the front or the rear, but from their distribution it would appear that Cain was struck from somewhat above the skull.

Defendant testified that he was talking to Cain on the evening of August 11, the day preceding the difficulty and not on August 12. Defendant's version of the occurrence was that, when he walked into his cabin at approximately 10 p. m. on the night of August 12, 1959, he heard a noise back in the closet and he picked up the hammer from off the table. At that time a man pushed him and hit him in the chest and said, "You son-of-a-bitch." Defendant staggered back against the doorway and then hit the other person twice with the flat head of the hammer. The other fellow then said: "I'll fix you." Defendant recognized the voice of the person, who had pushed and hit him, as that of Millard "Petey" Cain. Defendant further testified: "I kept pushing with one hand and I take the second lick and he staggered back in the corner. I turned the light on and I seen he was knocked out." Defendant struck Cain the second blow while both of them were in the clothes closet. He "did not hit Cain [while] in the cubbyhole." Defendant further stated that he had a box of dynamite in the closet and that Cain was lying with one shoulder on this box of dynamite. He had never drunk wine with Millard Cain, nor associated with him. He was afraid of Cain because of Cain's bad reputation as a violent and turbulent man. Defendant had borrowed the hammer to put up kitchen shelves.

Viewing the evidence in a light favorable to the State, it is clear that the court did not err in overruling defendant's motion for a judgment of acquittal as tendered at the close of all the evidence.

It is doubtful that the first assignment in defendant's motion for a new trial complies with Supreme Court Rule 27.20, but, assuming that it does, it is directed to certain portions of Dr. Albert F. Nibbe's testimony as contained in a deposition offered and received in evidence. Defendant says that the witness was not competent or qualified to give *expert testimony* as to the *force* or *number* of blows inflicted on the head and body of the deceased. Appellant says that this testimony invaded the province of the jury and was merely the conclusions and speculations of the witness, and the evidence should not have been ad-

mitted. Dr. Nibbe was a physician and surgeon licensed by the State of Missouri, and he was a member of the staff of the Noll Memorial Hospital at Bethany, Missouri. He had received a degree of Bachelor of Science from Northwestern University at Evanston, Illinois and a degree of Doctor of Medicine from the medical school of the same University, and interned at St. Luke's Hospital in Chicago. He made a careful physical examination of the deceased and treated him before his death and made an examination of the X-ray films that were taken. He was clearly qualified as a medical expert, and competent to testify with reference to the matters in question. As such expert he was in a position to aid the jury in determining the force necessary to produce the wounds and skull fracture and to determine the number of blows struck. His testimony did not invade the province of the jury, even though his opinion may have been upon specific issues to be decided by them. On this record we hold that the trial court did not abuse its discretion in admitting the physician's testimony. State v. Terry, Mo.Sup., 325 S.W.2d 1, 7(10, 11); State v. Paglino, Mo.Sup., 319 S.W.2d 613, 623(9–12); State v. Thresher, Mo.Sup., 350 S.W.2d 1, 8(13, 14).

■ The second assignment is that the court erred in overruling objections to State's Exhibits "B" and "C", which were photographs of deceased's naked head and showing the injuries inflicted. Defendant says there was no contention that deceased's death did not result from blows inflicted with a hammer and that the admission of the exhibits was cumulative and repetitious; they were offered to inflame the jury; and they were erroneous and prejudicial to defendant. The exhibits appear in the transcript and merely show certain marks on the top of the head of deceased. They apparently were taken after cleansing and suturing had been completed. The wounds appear only as four or five lines or marks and a spot on the top of the head. The exhibits were clearly competent to show the exact location of the wounds and they corroborated the testimony of the State's witnesses. We find nothing inflammatory about them. The court did not err in admitting these exhibits in evidence. State v. Moore, Mo.Sup., 303 S.W.2d 60, 65–66; State v. Thresher, supra, 350 S.W.2d 1, 7(9–11).

■■ The third assignment is that the court erred in refusing to permit defendant to testify as to his knowledge of deceased as a violent and dangerous man because of his personal knowledge of specific incidents and acts of the deceased, which testimony, if admitted, would have tended to justify the defendant in continuing to strike the deceased when he determined who he was. Defendant further contends that the giving of Instruction No. 10 (without permitting defendant to testify that the deceased was of a rash, turbulent and violent disposition since defendant had such knowledge because of his knowledge of specific acts of violence by defendant) did not remedy the refusal of the court to admit defendant's knowledge of the mentioned specific acts of violence by the deceased. There was evidence that deceased had a reputation for being of a violent and turbulent disposition, of which defendant well knew. The court did not err in refusing to permit defendant to testify concerning specific acts of violence by the deceased, because the deceased's reputation could not be proven by evidence of specific acts of violence. State v. Smart, Mo.Sup., 328 S.W.2d 569, 575 (9–11); State v. Cavener, 356 Mo. 602, 202 S.W. 869, 874(6); State v. Carson, Mo. App., 239 S.W.2d 532, 536(3–6). Since the general reputation of the deceased and defendant's knowledge thereof was shown by the evidence, the court properly instructed the jury to the effect that, if they believed and found from the evidence that the deceased was of a turbulent and violent disposition, and that defendant had knowledge of such disposition, such was a circumstance for the consideration of the jury in considering reasonable cause for defendant's apprehension that the deceased intended to kill him or do him some great bodily harm.

Defendant further contends that the court erred in giving Instruction No. 17 which urged the jury to attempt to reach a verdict if that could be done. Defendant contends that the instruction was given too soon after the jury had been deliberating and overemphasized the necessity for the jury to bring in a verdict in the case. Defendant insists that the fact that the jury did not fix the punishment shows that they were not allowed adequate time to bring in a verdict and fix a punishment.

From a careful examination of the record we were unable to determine when the jury retired to consider their verdict or how long they had been deliberating before the instruction was given; however, before ordering the evening meal prepared, the court recalled the jury to see what progress was being made. At that time the foreman advised the court that they would not reach a decision by 6 p. m., but that by 5:30 p. m. he might be able to give the court some more definite information. Subsequently, the court recalled the jury and gave Instruction 17. Thereafter, following a recess, the jury retired to deliberate further and subsequently brought in the verdict as follows: "We, the jury in the above entitled cause, find the defendant guilty of manslaughter, and his punishment to be set by the Court, as the jury could not come to decision on length of sentence. /s/ Raymond Amery, Foreman".

■■ From a careful consideration of the full content of Instruction No. 17 we have reached the conclusion that the instruction in no way tended to coerce the jury, nor did it overemphasize the importance of an agreement being reached. There is no indication that it in any way influenced the jury to reach the particular verdict which was returned, and we are satisfied that the instruction, in the form given, could not have prejudiced the rights of the defendant. It is well settled that it is permissible for the court to temperately and moderately remind the jury of the importance of agreeing upon a verdict, if that

is reasonably possible, and particularly so where the court instructs the jury as was done in this case, in part, as follows: "Open and frank discussion by you in your jury room of the evidence in this case may aid you in agreeing upon the facts; however, no juror should ever agree to a verdict that violates the instructions of the Court, nor find as a fact that which under the evidence and his conscience he believes to be untrue, yet each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in the spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict."

■ The matter of subsequently instructing a jury as to the desirability of agreeing upon a verdict, where such jury has had the cause under consideration for more than a reasonable time, has been discussed in numerous cases. See State v. Stegall, Mo. Sup., 327 S.W.2d 900, 901(1, 2). Instruction 17 was not given to the jury in the first instance, nor did it advise the jury that, if they could not reach a verdict as to punishment, the court would fix the punishment, nor did it deal with the issue of fixing punishment at all. See State v. Stuver, Mo.Sup., 360 S.W.2d 89, where a jury was so instructed in the first instance. And also see State v. Keller, Mo.Sup., 344 S.W. 65, 68(5–7) where a judgment was reversed in a case where an instruction was held to be coercive of the jury. In the case at hand Instruction No. 17 fully conformed to the ruling stated in the Stegall case and there is nothing in the record to show that adequate time for deliberation was not given prior to the giving of the instruction, or that the instruction, when given, resulted in a hasty verdict of guilty without giving adequate time for the jury to fix the punishment, or to consider all of the evidence, including that offered on behalf of the defendant.

■ Error is assigned on the refusal of defendant's Instruction No. F "as to threats made by the decedent in regard to the defendant or anyone attempting to live in the

cabin in question, both communicated and uncommunicated threats, which justified the defendant being fearful of his person and justifying the defendant in his conduct and in the amount of force used to repel the decedent at such time and place as is in evidence", so that the jury "could consider the same in determining who was the aggressor at that time and place." The instruction was directed to threats "prior to the killing." We find no such evidence in the record. From a careful reading of the entire record the only evidence indicating a threat occurred after the time the defendant admits that he had struck deceased on the head twice with the hammer. Clearly the instruction was not directed to this subsequent statement by deceased, "I'll fix you." No evidence of uncommunicated threats appears in the record.

■ The next assignment is that "the Court erred in giving Instruction No. 4 which contains an attempt to define the phrase, 'Reasonable Doubt', and that the attempted definition of the same was and is inaccurate in law and does not correctly and fully define 'reasonable doubt', and said instruction mislead and confused the jury." The assignment does not comply with the requirements of Supreme Court Rule 27.20, but was apparently directed to the words "if you have a reasonable doubt of the guilt of the defendant, you must acquit him; but such doubt to justify an acquittal, must be a substantial doubt founded on the evidence, or lack of evidence, and not a mere possibility of the defendant's innocence." The instruction is in approved form. The court did not err in giving Instruction No. 4. State v. Armstrong, Mo.Sup., 361 S.W.2d 811, and cases cited therein; also State v. Velanti, Mo.Sup., 331 S.W.2d 542, 545(4); State v. Willard, 346 Mo. 773, 142 S.W.2d 1046, 1051(8).

■ Error is assigned on the giving of Instruction No. 9, a manslaughter instruction. Defendant says there was no evidence that defendant killed in the sudden heat of passion and that the instruction duplicated Instruction No. 5, the main instruction on manslaughter. The instruction was directed to defendant's alleged finding of deceased in his home without permission and deceased's assault upon him, and to the heat of passion and fear aroused by deceased's presence under the circumstances. According to defendant, the deceased first assaulted him and struck him in the chest. The issue of defendant's guilt of the crime of manslaughter was properly submitted. Clearly, the instruction did not overemphasize or magnify the finding of defendant guilty of manslaughter, as contended in the motion for a new trial. The court did not err in giving the instruction. State v. Smart, Mo.Sup., 328 S.W.2d 569, 574(4, 5–7, 8); State v. Littlejohn, 356 Mo. 1052, 204 S.W.2d 750, 752(3) and State v. Davis, Mo.Sup., 34 S.W. 2d 133, 135(3–5).

■ is assigned on the giving of Instruction No. 13, as follows: "The Court instructs the jury in making up their verdict they will entirely disregard all testimony with reference to the defendant having been drinking. The influence of intoxicating liquors cannot justify, excuse or mitigate, and the fact, if it be a fact, the defendant may have been under the influence of intoxicating liquor to any degree at the time of the deceased's death, cannot be taken into consideration by the jury in making up their verdict." (Italics ours.)

The assignment of error, in three sentences, is that the instruction is "an unfair and unwarranted comment on the evidence for the reason that intoxication was not a defense on the part of the defendant, and for the reason that the Court told the jury that they should entirely disregard all testimony in reference to the defendant having been drinking"; that "The statement of the Court that the jury should disregard all testimony with reference to the defendant having been drinking was prejudicial to him and denied him a fair and impartial trial because the evidence as to his drinking was material and to the judgment he would [sic] in repelling an intruder and aggressor in his home and was material in connection with

any statements he made after the alleged crime occurred to the coroner, city marshall and law enforcement officials when the defendant was in their custody"; and that "It is common knowledge that an intoxicated person is not capable of exercising sound and prudent judgment nor expressing himself coherently or sensibly nor in realizing his rights, or his position as an accused murderer."

Defendant offered no evidence tending to show that he was drinking or under the influence of intoxicating liquor when he testified at the trial, or when he made any statements, admissions or declarations against interest prior to the killing in question. While it was necessary for the State to use subsequent admissions and declarations of the defendant to make out a prima facie case for the jury, yet, when defendant testified, the killing of Cain by defendant was admitted, the actor identified and the method used to produce death confirmed in conformity to the defendant's prior admissions and declarations as shown by the State's evidence. Defendant at no time made confession of guilt, or admitted criminal conduct. While there is some authority to the effect that the fact of intoxication may be considered by a jury as lessening the weight of a confession (State v. Smith, Mo.Sup., 342 S.W.2d 940, 941; 23 C.J.S. Criminal Law § 828), still in this case, the killing in accordance with the subsequent declarations was admitted by defendant at the trial. The State's case, therefore, does not rest upon alleged admissions, confessions or declarations made by defendant while intoxicated, but upon other evidence. The instruction, as drawn, expressly applies to "the time of deceased's death" and not to the time of defendant's subsequent statements. It is true that the first sentence of the instruction is very broad, yet it must be read and considered in connection with the second sentence which refers to the *time of the killing* and prior to the time that any admissions or declarations were made while defendant was in an intoxicated condition. Further, there was no evidence tending to show that

defendant made any mis-statements of fact due to drinking or to intoxication. The instruction correctly declares the law of this state as applicable to the facts of this particular case and cannot be construed as an erroneous comment on the evidence. State v. Bartley, 337 Mo. 229, 84 S.W.2d 637, 641–642(10); State v. Small, Mo.Sup., 344 S.W. 2d 49; State v. Bobbst, 269 Mo. 214, 190 S.W. 257, 261(9); State v. Smith, supra. In view of the entire record in this case, we do not find Instruction No. 13 to be prejudicially erroneous.

■■■ Error is assigned on the refusal of the court to give defendant's offered Instructions "A" and "B". The applicable rules of law sought to be submitted in these instructions were fully covered by other instructions given by the court, but defendant says that Instruction No. 4, heretofore referred to, was erroneous. We have overruled this contention. The assignment with reference to the refusal of Instruction "B" is too general and indefinite to comply with Supreme Court Rule 27.20. It merely says that Instruction "B" correctly sets forth the law and should have been given. In any event, the matters sought to be submitted by these instructions were properly and sufficiently covered by other instructions. The issue of self defense was covered by Instructions No. 5 and 8, and the issue of protecting one's home was covered by Instruction No. 7. The matter of each juror voting his own convictions was fully covered by Instruction 17. In many respects the instructions given were similar to those refused. No error appears. State v. Wright, Mo.Sup., 336 S.W.2d 714, 718(3).

■■■ Error is assigned on the refusal of defendant's Instruction No. "D". This was a cautionary instruction with reference to any alleged statements and admissions made by defendant. It is contended that "the greater weight of the State's evidence as to the defendant's guilt was based upon statements and admissions made by the defendant within a short time after the alleged crime"; and that, since "the evidence

in the case showed that the defendant was in some degree of intoxication and was in shock and emotionally upset [when the admissions and statements were made] * *, it was essential to the defense of the defendant that Instruction No. D should have been given by the Court." We think the instruction was properly refused since it singled out particular evidence and advised the jury that the particular evidence should be received by them with *great caution*, and in so doing the instruction tended to overemphasize the extent of caution applicable to such evidence and invaded the province of the jury. Further, the instruction, if properly drawn, was unnecessary in view of the State's Instruction 12 on the credibility of witnesses. State v. Clark, Mo.Sup., 277 S.W.2d 593, 601(10). Further, the instruction is not limited to the period of time immediately after the killing, but includes admissions and statements up to the time of the trial of the cause. The court did not abuse its discretion in refusing defendant's Instruction "D". State v. Bobbst, supra, 269 Mo. 214, 190 S.W. 257, 261(10) (instruction properly refused); State v. Williamson, 343 Mo. 732, 123 S.W.2d 42, 45(7) and State v. Henderson, 186 Mo. 473, 85 S.W. 576, 583. And see comment in State v. Clump, 16 Mo. 385, 387–388 where the court said that the "doctrine or mere legal rule of receiving evidence of verbal confessions with great caution, was the enunciation of an abstraction, not calculated to assist the jury in finding their verdict."

It is further contended that the court erred in failing to instruct the jury as to the extent of consideration to be given to the evidence concerning the bad reputation of the deceased, which would authorize and justify the defendant in acting more quickly and more forcibly than he might otherwise have done. There is no merit in this assignment, since the court properly instructed the jury as to the effect to be given to the evidence of deceased's bad reputation. The issue was fully covered by State's Instruction No. 10. State v. Parker, 358 Mo. 262, 214 S.W.2d 25, 27(4).

It is further contended that the court erred in permitting the prosecuting attorney to bring a bundle of clothing and shoes and other articles tied with a belt into the courtroom in the presence of the judge and the jury. It is contended that these articles tended to inflame and prejudice the jury against the defendant. From a careful reading of the record in this case it does not appear that any such display took place in full view of the jury, nor does it appear from the transcript that any such articles were presented in the courtroom. The assignment is overruled.

■ It is further contended that the court erred in failing to give an instruction as to the consideration to be given to prior convictions of the defendant, and admissions of arrest. Defendant says the jury should have been instructed to disregard prior convictions or admissions of arrest, except insofar as they would go to affect the credibility of the defendant as a witness. The record shows that defendant testified he did not remember whether he had ever been convicted of a criminal offense, but later he said he had been arrested but not convicted. The defendant did not request an instruction with reference to this issue, which was clearly a collateral matter on which the court was not required to instruct where an instruction was not requested. The court, therefore, did not err in failing to instruct on this collateral issue where no request was made by defendant.

■ Assignments 16 and 18 wholly fail to comply with Supreme Court Rule 27.20 in that they are mere general assignments and preserve nothing for review. Assignment 16 charges that the court erred in admitting illegal and incompetent testimony on behalf of the State and in excluding competent and legal testimony offered by defendant. Assignment 18 merely states that the verdict is contrary to the law and the evidence. Neither assignment is sufficient to comply with Supreme Court Rule 27.20. State v. Ivory, Mo.Sup., 327 S.W.2d 870, 871

(3); State v. Pinkerman, Mo.Sup., 349 S.W. 2d 951, 952(1).

Assignment 17 is to the effect that "the court erred in accepting and receiving the verdict from the jury when the same had been decided after a short time of deliberation by means other than a fair expression of opinion on the part of all the jurors." The assignment is without merit because it is not supported by any evidence or factual recital in the record and the statement does not prove itself. We have also examined that portion of the record required to be examined under Supreme Court Rule 28.02 and we find no error.

The judgment is affirmed.

All concur.